132179, AngioDynamics, Inc. v. Biolitec AG, et al. We'll take a break after this case. Mr. Griffith, if you're ready, please. Thank you, Your Honor. Good morning, Your Honors. My name is- Okay, can we start with the proposition that there was a flat violation of the preliminary injunction? I think there isn't really much doubt about that, and then proceed from there. Certainly, Your Honor. We actually have argued that the actual merger that was committed, or that was concluded, was different than the proposed merger that was prohibited in the preliminary injunction. All right, we've heard it. Now move on. Sure, you certainly are. May I reserve two minutes for rebuttal? Yes, you may. Thank you. And so we're here at this first session on the appeal of the District Court's contempt order. And that contempt order has now arguably imposed $167 million in sanctions against the defendants. The District Court made a fundamental error of law in issuing that order because the District Court confused the purposes of criminal contempt with the remedial purposes of civil contempt. In fact, in this Court's 1944 decision in the United States v. Parker, this Court made it absolutely clear that civil contempt, as opposed to criminal contempt, is purely remedial. And that goes for the two different types of civil contempt. Compensatory civil contempt sanctions, which are designed to compensate a party for the damages suffered from a violation of an order, as well as coercive sanctions, which the District Court, in this case, characterized the sanctions as coercive, coercive in the sense of compelling or coercing a party to comply with a court order. Well, wasn't the District Court attempting to get your client to do what it said it could do, which was to reverse the merger, however you want to characterize the merger? Your client and you said that the merger could be reversed exactly as it had been done in the first place. You set up a new straw company and you put it back to where it was. Wasn't that a perfectly legitimate purpose of what the Court did? Well, we don't think so, Your Honor, because for one thing, the Court repeatedly stated that its primary purpose for imposing these coercive sanctions was to vindicate the Court's authority. In our reply brief in the preliminary statement, we outlined ten different places at the two contempt hearings, as well as in the two decisions the District Court entered, in which the District Court makes it absolutely clear that the District Court was focused on vindicating its authority. And indeed, it states something that is completely contrary to this Court's decision in Parker, and that was that the merger had taken the dispute away from being a dispute between two civil litigants and it had become an issue of the integrity of the Court. But by definition, that's why we have the word contempt. I mean, every contempt, civil, criminal, whatever, implicates the authority and dignity and integrity of the Court orders, and the judge was just observing that. The question then is, what does he do? If it had been an individual, he would have thrown him in jail and said, I am the director of the magnitude of the harm that was threatened by continued contempt. That is a holding of the United States Supreme Court in the Mine Workers case. It was reaffirmed in Bagwell, the U.S. Supreme Court case in 1994. And this Court's decision in Hawkins, the 2012 case, also repeated that. Well, as I understood this, your client, by proceeding with the downstream merger and moving the company from Germany to Austria, has made it virtually certain that the plaintiff will never collect on the judgment that it is owed, that its best chance was to sue in the German courts because the company was located there. So this judge has a problem. He'd like you to reverse what you did in violation, pardon me, not you personally, your client, in violation of the preliminary injunction. You come in and say, sorry, Your Honor, regardless of what we said before, we can't undo it.  You appear in front of him and explain why he can't and explain how he's going to do it anyway. And so he wants him to show up. What's wrong with that? Your Honor, there's nothing wrong with the Court asking Dr. Neuberger to attend the hearing. The problem with your question, though, is the premise, and that is... You can't collaterally attack in this Court the preliminary injunction which was approved by this Court. We're not doing so, Your Honor. There is a part of this appeal that is appeal of the Rule 60 motion seeking to vacate the preliminary injunction. That's not a collateral attack. And by focusing on the lack of harm that the merger actually... Well, how can you say the lack of harm? There's apparently adequate evidence that the absolute reason for doing this, although you claim there's some other economic reasons, was to put the assets of the company out of reach of this lawsuit. And that once you were in Austria, you would have to start an entirely new lawsuit all over again after years of this litigation here. How do you get around that? Your Honor, if there is one point that I'd like to leave with you, is that what you characterized as the evidence in this case is mistaken. Because there is not a shred of evidence that this merger has put any assets that were available in Germany out of the reach of the plaintiff. This is a collateral attack on the preliminary injunction which could not have been entered without a satisfactory showing of irreparable injury had the merger been allowed to go forward. The only... the nature of the injury that was focused upon in all of the briefing on the preliminary injunction, on the motion for reconsideration of the preliminary injunction, and in this Court's affirmance of the preliminary injunction, was the movement of assets from Germany to Austria. The original merger intended to move the entire company from Germany to Austria, including assets, including the headquarters, and the merger that took place did not do so.  We'd like to do this lesser merger, which doesn't move any assets. He never asked the Court whether this was okay. He went ahead and did what he thought he could do, and you're now telling us that we should take the word of this person that the assets are still there. No, I'm not, Your Honor. I'm saying that if a contempt was committed by this merger, then the next question that the District Court should have asked is, what is the harm, and were assets moved? There was never any question about that. Why does it need to get that specific? The plaintiff wants the status quo, and your client doesn't want the status quo, and it's got a feeling that it's because it makes it harder to collect the judgment. We're dealing with foreign law. Who knows how it will actually work out over there? So the Court preserves the status quo. Your Honor, I believe that federal judges have an obligation to decide legal issues, whether they are foreign legal issues or not, and in this case, the issue that we've been describing as the corporate domicile issue, the only evidence before the Court was the unrebutted expert declaration saying that the movement of a corporate domicile from Germany to Austria has absolutely no effect on the plaintiff's ability to enforce a judgment against that company in Germany. Now, in fairness, we understand all of that. We've read these briefs very carefully. Let's assume we find that the district court did, in fact, do the requisite inquiry into harm. What is left of your argument against the contempt citation? The amount of damages are excessive. And how do we measure that? Well, again, you have to measure it by the magnitude and the character of the harm. And here, there is absolutely no evidence that any... Okay, but that argument aside, it's dependent on an argument I've just rejected. What's left of the contempt? One of the paradynamic qualities of a civil contempt order, a civil arrest order, is that the contemnor has the keys to his own jail cell. In this case, Mr. Neuberger did never have the keys to his own jail cell, because the contempt order was imposing a relatively complicated directive of affirmative action that would take months. And if you look at the judge... But he didn't try. That's true, Your Honor. But my point is this. The answer to the question of if you conclude that the contempt sanctions were not excessive and also appropriate for civil coercive sanctions, then the additional reason why you should strike down these contempt orders is because the contempt order imposes a very complicated set of actions that is not appropriate in a civil contempt setting. And I refer you to the concurring opinion by Justice Scalia in the Bagwell. Thank you. Good morning, Your Honor. Bill Reynolds for AngioDynamics. The Court already, with your questions, covered a lot of the arguments that I wanted to make. And I don't want to belabor the point. There was one thing, though, that I did want to correct, because all of you, Your Honor, your judges, you all identified the fact that you can't collaterally attack the preliminary injunction. There was a statement made a few minutes ago that this issue about moving of assets wasn't raised in the preliminary injunction argument. That's absolutely not true. It was presented to this Court. And, Chief Judge Lynch, you were on that panel. You can look at page 2 of the defendant's reply brief on that appeal. And it specifically says, all of Violatec AG's current assets will still belong to Violatec AG after the merger, and all assets currently located in Germany will still be located in Germany. That's exactly, word for word, the same argument that was made after the injunction was violated. That's page 2 of the brief, file on this appeal. This Court rejected it, Your Honor. You were on that panel, Chief Judge Lynch. I remember it. Yes, I do too, Your Honor. What good is this contempt order going to do you in terms of ultimately collecting on the assets? Well, I'm glad you asked that, Your Honor, because to date it has had no effect whatsoever. Mr. Neuberger, or Dr. Neuberger, has residences apparently all over the world. He is subject to an arrest warrant in the United States, but he can easily not come to the United States. He still operates through his corporate structure. He operates entities in the United States that are located in the Commonwealth of Massachusetts. But he himself can stay out of the United States. As you know, you mentioned Judge Keada. They haven't taken one step of any kind to reverse the merger. There has been not one penny of the fines that's been paid. I mean, I guess the question I would ask for the Court is, I think it was you, Chief Judge Lynch, who asked, you know, how do we measure the appropriateness of the fines? I mean, the District Court was trying to coerce, trying to find some way to coerce the defendants. He thought and found, and I think correctly, that probably the best way, as I think you said, Judge Keada, would be to get Neuberger into custody. If he got him into custody, then I think you'd see some action. Then we would see some steps taken. If these cases should end here, is there any likelihood that that's going to change the situation? In other words, will you be able to collect on any of this, including the basic judgment? Judge Stahl, I would say that it's impossible to predict what's going to happen. The only avenue that's available to us at this point is to try to collect against. I mentioned that there are other subsidiaries located in Massachusetts. It's to try to collect against any assets of those subsidiaries. But realistically, this whole, I would quote the Chapter 11 trustee that was appointed for BioLitech, Inc. a couple of years ago. She was a former bankruptcy judge, and she said that Neuberger operates this whole international corporate structure like a shell game. And I don't expect to find any substantial assets in the U.S. entities. I am going to, on behalf of my client, try to see. We've actually started a trustee process in front of Judge Ponser to try to execute this judgment against U.S. entities. But we have no prospect of enforcing it against any of them. What about the $167 million? I mean, you have a damage claim, as I recall, roughly $20 million, and then a request to treble it, and ultimately got it all tallied up in a best-case scenario to $71 million or something. So how can you have a contempt sanction in a civil damage action where the only issue is damages that itself exceeds the total damages of the case? Well, I would say, Your Honor, that the sanction, the fine that Judge Ponser imposed is not to be paid to AngioDynamics. And it's not meant to be compensatory to AngioDynamics. We didn't ask for damages. When we move for contempt, we ask for coercion. I mean, our view was and remains the only way that this case would ever ultimately result in genuinely coming close to satisfaction. Right. But whether or not you get it, the Court's got to look, is it $10? Is it $10 trillion? It's got to pick a number somewhere between. Doesn't it try to roughly gauge what's at issue in the case itself where it's a damage action? So why would you set the damages so they could exceed the claim in the case? Well, I would say what this Court said in Hawkins two years ago, which is a very paradigmatic civil contempt case, and in Hawkins you were relying on the earlier Supreme Court case of United Mine Workers, is that in imposing coercive sanctions, the district court needs to look at the harm, which was already found, as we've discussed, and then the likelihood of achieving results with the sanctions. The thing about these sanctions is the reason why the number is so large now, Your Honor, is because the defendants haven't done anything to undo the sanctions. I mean, they were imposed on a periodic basis. So the merger was completed almost two years ago. It was completed March 15, 2013. I promptly moved for contempt sanctions. Judge Ponser issued his order promptly. But he actually didn't impose the first monetary sanction until almost two months, 56 days, after the merger was completed. So that already had given them two months to start doing something. That first sanction was only $1 million. The second sanction about three weeks later was $2 million. And then they build up month after month after month. But the reason why the number is so large now is just because the defendants haven't done anything. But if we look at the total number now, what do you tender as the relationship? How would we describe the relationship between the contempt fine and the harm that was sought to be avoided by creating the fine? I think that Judge Ponser was trying to, he said it in his decision, he was trying to come up with a substantial monetary fine that he thought would be substantial enough to coerce the defendants. In relationship to what? In relationship to the size of the defendants as an entity. I mean, they do, as far as I know, continue to generate in the neighborhood of, I think it was stated in one of the defendants briefs, $260 million in revenues a year worldwide. It was meant to be a significant amount. I suppose there is the theory that if the underlying damage claim is $20 to $25 million and treble it $70 to whatever, $75 million, you need a sanction larger than that as an incentive to get the defendant before you to take the action so that you can collect on the underlying judgment. That at least is not an irrational theory. But as Judge Ponser said, if they come into compliance, he will reduce the amount of the sanctions. He's actually said that, Your Honor, and he said that, actually, if you'll bear with me, I quoted this in my brief, and I know you guys have reviewed the briefs very carefully, but just to reiterate this point, Judge Ponser said, I'm quoting him, I will consider any plan that you want to submit at any time, and I will revoke the warrant. He mentioned the warrant. As soon as I'm convinced that what has been done has resulted in effective and substantial compliance with the court's initial order, meaning the preliminary injunction. This is just to respond to the statement about the authority and dignity of the court. He said, this is not intended to be punitive. I want my order complied with. I'm quoting from page 37 of my brief. And then later he said that the court would immediately consider any plan offered by defendants to revoke, eliminate, or in any practical way rendered nugatory. And he said, if the court were convinced, I'm now on 38 of my brief, if the court were convinced that a plan submitted by defendants were effectively aimed at remedying the contempt, a motion to reduce or vacate the sanctions would be considered. I mean, I think he made that message very clear, and the defendants promised that they would propose a plan. And they said that it was actually very simple. This is from page 18 of my brief on this appeal. It only took a few lines in the transcript for defense counsel to say what had to be done, and I think it was you, Judge Stahl, who said it. It would basically have to do, I'm quoting defense counsel, it would basically have to do the same thing that was done to move the domicile to Austria, but in reverse. Namely, a new company would have to be recreated in Germany, and a downstream merger would have to take place. It took two sentences to describe what would have to be done. And Judge Ponson made it very clear that if he even saw a plan suggesting that they were going to try to do that, he would have amended the sanctions. So, I mean, I do agree that the monetary amount is very large, Your Honor, but it's only because the defendants have absolutely refused to do anything. They've made it very clear they're not going to do anything to undo it. If the Court doesn't have any other questions, I'll rest on the briefs at this point. Thank you. Thank you, Your Honor. I'd like to respond briefly to what my brother mentioned in terms about the decision by the district court and also this court affirming the preliminary injunction. The issue of harm here and the remedial nature of civil contempt is not a collateral attack on the preliminary injunction. The only irreparable harm decision that was made, and it was made because of the brief and the arguments that ADI submitted to the district court and on this court, was based on the potential movement of assets from Germany to Austria. Now, that was wound up and combined with this merger because the merger was intended to accomplish two things, move the corporate seat. Why does the court have to believe anything your client or its experts say at all? Why can't it just draw the inference that anyone who would do something like this in the face of a court order without an apparent driving of the reason must be of the view that it's helping them hide the assets and leave it at that? I don't think that is the appropriate standard here. And that's another reason why the criminal safeguards for criminal contempt are very important in this case because there's been no opportunity for the defendants to verify the fact that no assets have been moved because Well, he could have come to the United States and he could have had his deposition taken. And I recognize there might have been some risks in that, but if he wanted to do it, he could have done it. He could have done any number of things along the way. And every single step of the way, at least from what I've been able to read, has been to frustrate any attempt at getting to the bottom of getting recompense for the failure to do what the contract required them to do, which was to originally stand for the suit that the plaintiff had to stand for. Both ADI and the district court have done a very good job in portraying the conduct of my client as not very good. But in fact, if you look at it, it's true that they completed this merger, but there is absolutely no evidence that the headquarters was moved or assets moved. That was not the basis of the motion. Which your client easily could have put before the court and ameliorated some of its concerns. But your client has chosen not to do so. And taking appeals, of course, always delays what happens in cases. Do you have any other point you'd like to make? Only, Your Honor, that in fact my client submitted declarations from the chief financial officer as well as the chairman of the supervisory board confirming that no assets had been moved from Germany to Austria. And if that is the basis of this contempt, that was not the evidence that ADI You're now repeating yourself. Thank you, Your Honor.